**MATTHEW C. ELLIS, OSB No. 075800**
matthew@employmentlawpdx.com
**Matthew C. Ellis, PC**
1500 SW First Avenue, Ste 1000
Portland OR  97201
Telephone: 503/345-5407

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| **MEGAN PLETT,** an individual,<br><br>          Plaintiff,<br><br>     v.<br><br>**WHITE BIRD CLINIC,** an Oregon domestic nonprofit corporation,<br><br>          Defendant. | CASE NO.   6:25-CV-00109<br><br>**COMPLAINT FOR DEPRIVATION OF CIVIL RIGHTS**<br><br>**Jury Trial Demand** |

### I. JURISDICTION AND VENUE

1. This is an action for damages for violations of state and federal law under U.S.C. § 2000e and O.R.S. 659A.030. This Court has jurisdiction over Plaintiff's federal (Title VII) claims under 42 U.S.C. 2000e-5(f)(3), 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3)-(4). This court has supplemental jurisdiction of Plaintiff's state law claims under 28 U.S.C. § 1367.  Both federal and state law claims alleged herein arose from a common nucleus of operative facts, and the state claims are so related to the federal claims that they form part of the same case or controversy such that the actions would ordinarily be expected to be tried in one judicial proceeding.

2.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, in that the claims and events giving rise to this action alleged herein occurred entirely in Lane County, Oregon.

## II.  PARTIES

3. Plaintiff Megan Plett is a citizen of the United States. Plaintiff was employed by Defendant White Bird Clinic in its CAHOOTS program as a Medic from on or about October 16, 2020, until March 11, 2023. As part of that work, Plaintiff worked as a Medic for Defendant, providing first line crisis services to vulnerable residents of Lane County, Oregon.

4. Defendant White Bird Clinic is a domestic nonprofit corporation registered in Oregon and with a principal place of business in Eugene, Oregon, County of Lane. Defendant's mission is to enable people to gain control of their social, emotional and physical well-being through direct service, education and community.   One way it does this is through the operation of the CAHOOTS (Crisis Assistance Helping Out On The Streets) program; a mobile crisis intervention program staffed by White Bird Clinic personnel using City of Eugene vehicles. The White Bird Clinic is or was a contractor of the City of Eugene for the CAHOOTS program and received significant financial renumeration from the City of Eugene—over $835,000 per year under its most recent contract for the CAHOOTS program, alone—in addition to other funding. Defendant, through the CAHOOTS program, takes on many of the social service-type calls for service that would otherwise be routed to the Eugene Police Department and Eugene/Springfield Fire and often provides initial contact and transport for people who are intoxicated, mentally ill, or disoriented, as well as transport for certain kinds of necessary non-emergency medical care. All in all, somewhere between 3-8% of calls to the Eugene Police Department are routed to Defendant's employees in the CAHOOTS program.

## III.  FACTUAL ALLEGATIONS

5. Plaintiff began work as an employee of Defendant as a Medic in its CAHOOTS program on or about October 16, 2020.  Working for Defendant's CAHOOTS program was Plaintiff's "dream job" because it combined her past history as an unhoused youth with her medical training and was consistent with her goals to work toward social justice.

6. Defendant's CAHOOTS program uses a nontraditional, nonhierarchical consensus-based organizational structure. No one is officially designated as a direct supervisor of anyone else, leaving decisions impacted the terms and conditions of employment to be made, at least in theory, on a collective basis.  This includes decisions about performance, the day-to-day operations of the program, training, scheduling, hiring and firing most other terms and conditions of employment as well. As a practical matter, the lack of organizational structure results in an employment environment where those with the strongest personalities or those who are the most well-liked can operate unchecked in positions of power, authority and influence—sometimes even assuming specific titles or positions within the organization with little to no oversight.  One such person is longtime employee Brenton Gicker who has worked as a nurse /EMT for Defendant since approximately 2008. On information and belief, Mr. Gicker works for Defendant to this day.

7. Defendant's post-hire training program for Medics takes several months. In the first few months of training, when still a trainee, co-workers warned Plaintiff about Gicker. They informed her Gicker was a predator and to stay away from him.  As her training continued, she was provided with more specific information, including that he could be sexually inappropriate with employees and clients. Clearly, Defendant was on notice of Gicker's issues with women well before Plaintiff started working for Defendant.

8. Plaintiff was deemed "fully trained" by spring of 2021. On or about that time, Gicker took control of the scheduling of Plaintiff's shifts and started scheduling him to work in the same vehicle as Plaintiff so they could work together closely.

9. Plaintiff had not regularly worked with Gicker until this time. And, while she was warned about his conduct and treatment of women, she found him, at times, charming. Plaintiff, who was new to Eugene, started spending time with Gicker, and other co-workers, socially outside of work.  Then, soon after Plaintiff was fully trained, on or about April or May 2021, Plaintiff and Gicker had consensual sexual relations on one occasion.

10. The next time Gicker and Plaintiff were alone, on or about May or June 2021, Gicker sexually assaulted Plaintiff.  The context for that interaction was that Plaintiff and Gicker were at Gicker's house after work. While at his house, Gicker forcibly pulled Plaintiff's pants down and raped her. Ashamed, Plaintiff left when he was done and did not return.  On or about a week later, Plaintiff went on medical leave for emergency surgery that ultimately resulted in her missing several weeks of work as she recovered.

11. As she started to get close to her return to work, on or about July 6, 2021, Plaintiff spent time with Gicker at a bar after his shift was done. Plaintiff was almost ready to return to work but was still using a cane from her surgery and was physically very uncomfortable.   Gicker walked Plaintiff home afterward, but Plaintiff didn't let him in. Gicker grabbed Plaintiff's face hard, kissed her and slapped her on her cheek, calling her a "stupid bitch." Then, in order to inflict as much pain as possible, Gicker deliberately struck Plaintiff at the location of her surgical incision, causing intense pain. Plaintiff shut the door and Gicker left.

12.  Plaintiff had enough. He texted Gicker to let him know that his conduct had to stop, opposing his sexually inappropriate words and conduct. Gicker texted an apology, said that he was "just being silly" and reinforced how much respect he had for Plaintiff. He wanted to visit Plaintiff at her house to talk things through, but Plaintiff said no.

13.   After the sexual assaults, Plaintiff reported Gicker's conduct to a co-worker, Liz Mitchell. Mitchell, then, informed Gicker of her report.

14. Starting in the Summer 2021, Plaintiff made attempts to change her work schedule to avoid Gicker. One co-worker, Dandy, knew of Gicker's history and asked Plaintiff, "Are you changing your shifts away from Brenton because he abused you?" Plaintiff responded, "Yes." Dandy then responded, "I don't want to know what happened."

15. On or about Summer 2021, Plaintiff also informed co-worker Laurel Lisovskis that she didn't want to work with Gicker anymore. Lisovskis didn't ask why. Lisovskis responded by cutting Plaintiff's shifts over the next 4 months to make sure Plaintiff and Gicker didn't work together.  Lisovskis did not cut or modify Gicker's shifts.

16. On or about November 2021, Plaintiff reported the sexual assault to another co-worker, Ebony Morgan, a production coordinator. She disclosed to Morgan the assault and they created a plan to confront Gicker about his conduct. This included a plan for some form of restorative justice that would include him stopping drinking, stopping his inappropriate conduct toward Plaintiff and others and apologizing.  Morgan confronted Gicker about his sexual assault and a plan for reconciliation, but Gicker refused to engage. On information and belief, Morgan then spoke with a representative in Defendant's human resources in late 2021 or early 2022 to report Gicker's sexual assault of Plaintiff.  After Morgan's attempt to confront Gicker with a plan for restorative justice, Plaintiff also reported the sexual assault to human resources in Winter 2021-2022. The woman Plaintiff met in human resources took notes of the discussion but never followed up with Plaintiff.

17. By this point in late 2021 or early 2022, it was widely known amongst Defendant's CAHOOTS employees that Plaintiff had reported and resisted Gicker's sexual assault. In response, Gicker and his friends' treatment of Plaintiff changed dramatically. In response to Plaintiff opposing sexual harassment, misconduct and rape by Gicker, Plaintiff was subjected to a campaign of retaliation by Defendant, including human resources, that was designed to force Plaintiff to quit or cause her termination. The retaliatory conduct incudes, but is not limited to, the following

    a.    When Plaintiff and Gicker were at work at the same time, having Plaintiff wait in the basement until Gicker left;

    b.    Informing Plaintiff that no one wants to work with her anymore;

    c.    Placing Plaintiff on involuntary leave in fall 2022;

    d.    Nitpicking and micromanaging Plaintiff's work performance in an attempt to get her fired or get her to quit;

    e.    Lodging bad faith complaints against Plaintiff in an attempt to get her fired or get her to quit; including that she was poor at her job, emotionally unstable, selling drugs, doing unauthorized work and generally incompetent;

    f. Refusing to interact with Plaintiff during calls or giving her the "silent treatment";

    g. Cutting her work hours, resulting in losing approximately four months of wages;

    h. Second guessing Plaintiff's medical advice and recommendations and overriding Plaintiff's recommendations during calls;

    i. Attempting to coerce Plaintiff's termination or resignation based on alleged performance concerns that Defendant knew were false, in bad faith or retaliatory.

  18. Faced with Defendant's inaction and the increased retaliation, Plaintiff kept reporting the sexual assault. For example, in 2022, Plaintiff tried to tell Laurel Lisovskis about the assault and Gicker's treatment of women. Lisovskis shut down the conversation. She conceded that Gicker does a lot of bad things when he is drinking but that she doesnt want to know anything more specific.

  19. During 2022, Plaintiff witnessed Gicker be sexually inappropriate with clients on a number of occasions. For example, Plaintiff and Gicker went to a call to assist a woman having a psychotic episode. During the encounter Gicker commented to Plaintiff and others how he wished the woman didn't have underwear on. On another call, they responded to assist a young girl in distress. Gicker commented to Plaintiff and others that he "wanted to fuck her." Plaintiff estimates the girl to be no older than 16 years of age and possibly younger.

  20. Plaintiff reported Gicker's sexual misconduct against both her and clients on a number of times in 2022, but Defendant didn't do anything about it.

  21. On June 21, 2022, Defendant's Administration Operations Coordinator, Mike McMillan acknowledged in an email to Human Resources, Executive Coordinator Chris Hecht and outside legal counsel, Amanda Walkup. He wrote that Plaintiff, Ebony Morgan and others had reported Gicker's assault of Plaintiff. He also wrote that they had information suggesting that most of the staff was involved in mistreating or retaliating against Plaintiff for the report. When Hecht saw list of retaliators, he commented "Quite a list, looks like half the program!"

22. Defendant did not take reasonable steps to investigate the conduct or stop the retaliation. According to co-worker Arlo Silver, who also received a report of the assaults by Plaintiff on or about June 2022, many of the witnesses refused to be interviewed or, if they were interviewed, were not forthcoming in their answers. Silver wrote that the witnesses involved in retaliating against Plaintiff were not "cooperative" and the very few who were actually interviewed "gave answers that felt rehearsed." Silver wrote that HR concluded that the retaliators had conspired together in coming up with a defense to Plaintiff's claims against Gicker and that they had "shared the questions with each other" and failed to participate in good faith. Thus, as of October 2022, there had been no serious effort to look into Plaintiff's allegations, even as the retaliation continued. Silver informed legal counsel as much, stating "that they (Silver or Defendant) had asked repeatedly for a meeting with all HR employees to talk about the process and how unsupportive and bad it felt to my department but that the meeting was pushed off for weeks and finally dropped."

23. As referenced above, in 2022 Plaintiff had reported the sexual assault of Plaintiff and the sexual misconduct engaged in by Gicker against clients to Program Coordinator Silver at least once. Silver informed Plaintiff that she should speak Melanie Bickley, a new HR manager for Defendant, and report it yet again. Plaintiff then reported the same conduct to Bickley on or about October 2022. Bickley informed her there was nothing in Gicker's employment file about any misconduct or the prior complaints against him. Plaintiff was puzzled, as she and others had reported his conduct many times. Then, Bickley informed Plaintiff that she had found at least some of the information about Gicker, and that people at White Bird had tried to hide it from her.

24. Bickley's response to Plaintiff's report to her was bizarre. Bickley called Plaintiff frequently—sometimes several times a day—and appeared to want to act as Plaintiff's mental health provider for the assault which had occurred over a year ago. Plaintiff, who had never met Bickley before, did not want to use Bickley as a mental health counselor. Bickley also shared her own personal story regarding abuse over the course of many calls, sometimes becoming tearful about her own history. The interactions left Plaintiff wondering if Bickley was looking to

Plaintiff for emotional support for her own past history of trauma. Ultimately, feeling harassed by Bickley's behavior, Plaintiff informed Bickley that she did not want to talk to her about the assault anymore—she had already reported it over and over—and certainly didn't want to discuss about Bickley's past history of trauma. Plaintiff indicated that she looked forward to the matter being investigated and hoped the ongoing retaliation would stop. Bickley responded by putting Plaintiff, involuntarily, on mental health medical leave. Plaintiff resisted the leave, pointing out that didn't need to be on leave and pointing out that, if anyone, it was Gicker who should be on leave while they looked into the allegations.

25. Others brought forward complaints of sexually inappropriate conduct by Gicker, too. For example, on August 30, 2022, defendant received a letter by lawyers for a former employee, who alleged that Gicker exposed his penis during the workplace, which they saw as a "a blatant power move meant to degrade" the individual and "make them feel inferior." She said that she had previously reported the conduct to Lauren Lisovskis, who "laughed" and said, "It will probably happen to another trainee in the future because that's how Brenton is."

26. On October 25, 2022, Bickley reluctantly informed lawyer Amanda Walkup that she finally needed to put Gicker on administrative leave. She wrote, "It was reported to me from Meg / Arlo that Brenton is super inappropriate to underage clients, in addition to all the other things." On October 28. 2022, Gicker was placed on leave for his sexual assaults of Plaintiff and sexual misconduct toward underage clients, as well as "all the other things." Bickley contacted Plaintiff to inform her Gicker was placed on leave, but specifically noted that his administrative leave had nothing to do with Plaintiff or her allegations.

27. Walkup, as Defendant's agent, had known about the allegations for a long time. On October 31, 2022, Walkup contacted Dennis Westlind at the Bullard law firm, seeking advice about how to handle the investigation of Gicker. Referring to Plaintiff's allegations against Gicker, Walker told Westlind, "<u>I believe his misconduct has been going on for a long time, very little has been done about it, not sure about documentation up to this point</u>." (emphasis added)

28. Even the though his "misconduct has been going on for a long time and "very little has been done about it, Defendant still did not take reasonable steps to investigate the allegations against Gicker while he was on leave in late 2022. Instead, Defendant concocted a plan to confront Plaintiff with bad faith complaints about her performance in hopes of forcing to take a severance and resign. On December 29, 2022, overwhelmed by the situation, Bickley contacted Walkup and Weslind to inform them that she wanted to force Plaintiff out under the pretext of chronic poor performance. Gicker's plan was to offer Plaintiff a severance while simultaneously threatening her employment, in bad faith, knowing that she was being retaliated against by Gicker and his friends for opposing sexual assault and sexual misconduct. She wrote "I want to offer Megan Plett a severance package to walk away from Cahoots. Megan was the victim from Brenton. We are having an abundance of work performance issues coming up, and this makes the most sense. I'd like to essentially present her the complaints and performance issues that are arising, remind her of the PIP's that she was put on previous to all of this, and offer her probably 2 months' severance to walk away from all this, which is something she wants to do anyways. My question is – Can I do this? What role does the union play here? I know for a fact she will take it, and it is ABSOLUTELY worth it for us to have her walk away with a severance." Bickley did this knowing that the work performance issues were being manufactured by Gicker's supporters in bad faith.

29. At Bickley's request, Westlind responded with a plan to present the severance to the Plaintiff, with the union present—even though there was not a union contract in place—to encourage her to quit. Bickley commented that she was confident that the union—which Gicker and his friends had voted to join—would be <u>very</u> supportive of the decision to offer Plaintiff a severance and force her resignation.

30. Meanwhile, Gicker's friends started to lobby for Gicker to return to work, immediately. Late at night on January 12, 2023, Tatanka Maker, a supportive of Gicker's, sent an email to Bickley demanded that Gicker be returned to work immediately. He cc'd Mr. Hecht on this message, who had previously been notified that Maker, and others were retaliating against

Plaintiff back in June 2021. He also cc'd Ms. Barber, the chairperson of the board of directors, on his email.

31. Forty-one minutes after receiving Maker's late-night email, Bickley contacted Walkup and Westlind, at 12:01 am. She promised them a response to Maker and conceded that she hadn't yet had the meeting with Plaintiff to encourage her to quit because of the alleged "performance issues," nor met with Gicker who had been on leave for months. Regarding Maker ccing Chairperson Barber, she wrote, "Does this now mean I get to fill her and the board in on what's happening and going on in CAHOOTS and use this as an opportunity to disclose how much the way they've [the CAHOOTS staff have] ran their program has cost the agency?"

32. On March 1, 2023, Bickley met with Amanda Walkup and Elizabeth Stubs at the Hershner Hunter law firm and Jess Osborne of then the Bullard firm, now of the Miller Nash firm, to discuss the problems with Defendant's organizational structure and operation and its impact on the treatment of Plaintiff. They discussed how one of the problems at White Bird was that it was not hierarchical and a "community collective." This meant, as a practical matter, there was no real supervisory authority over any individual's performance and that a co-worker at CAHOOTs could force someone out if they so desired. Along those lines, Bickley disclosed that CAHOOTS employees had managed to put one of their fellow co-workers on administrative leave without even running it up the chain of command at Defendant or contacting HR. Bickley commented that if there are personnel investigations or related matters to deal with, "They do it themselves."

33. The other main topic of discussion was Plaintiff and Gicker, whose return to work from administrative leave was imminent. They discussed how Bickley was frustrated that Plaintiff had not agreed to accept a severance and quit ; an odd frustration since Bickley never actually offered Plaintiff a severance. The lawyer's notes of the meeting reflect that, on March 1, Bickley informed them, "<u>Meg and Brenton had nonconsensual sexual encounter off duty event</u>." They who Bickley conceded that Meg had "told mentor in Cahoots and <u>they encouraged her not to report it</u>. Meanwhile Brenton's friend in charge of schedule, he was unfair." Bickley

Page 10 – Complaint

MATTHEW C. ELLIS, PC
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

conceded that she was "skeptical about discipline" for Plaintiff. She, in no uncertain terms, told counsel, "<u>If this were any other employee, this would not be a conversation. She is being retaliated against.</u>"  (emphasis added)

34. Soon after March 1, 2023, Gicker returned to work from administrative leave. On information and belief, no serious investigation of him occurred while he was on admin leave.

35. Bickley she didn't feel like Plaintiff and Gicker could be around each other. Something had to give, and the something would have to be Plaintiff. On or about March 9, 2023, Bickley informed Bullard lawyer Jess Osborne that she wanted to put Plaintiff on administrative leave with an eye toward ending her employment. On information and belief, this was based on a bad faith complaint made by Ashley Cakebread, a close friend of Gicker's, who had worked with Plaintiff the day before.

36. Meanwhile, Plaintiff had finally had enough of the retaliatory treatment by Defendant that had been constant for over a year.  On March 10, 2023, Plaintiff, not knowing of the plan to put her, yet again, on involuntary administrative leave, but knowing of the bad faith complaint by Cakebread the day before, Plaintiff informed Defendant that would resign her employment effective April 8, 2023.

37. Bickley was ecstatic. Even though she had not, as of this time,  actually ever met Plaintiff in person, she promptly met went to work to meet Plaintiff to personally accept her resignation, inform her that her employment would end immediately and usher her off the premises in full view of her colleagues.  She then contacted lawyers Walkup and Osborne to inform them about Defendant's good luck, writing "try not to cringe/laugh/be frustrated after reading",  and summarized her interaction with Plaintiff, misstating and fabricating portions of their interaction to try to make Plaintiff look bad. Consistent with the retaliatory environment at Defendant, Bickley concluded her email to legal counsel writing,  "Luckily there was not a single person in CAHOOTS that didn't want her gone."  Thus, pursuant to and consistent with Defendant's discriminatory and retaliatory plan, Plaintiff's employment ended on March 11, 2023.

38. Plaintiff's resignation was a constructive discharge of her employment. Defendant's discriminatory and retaliatory conduct were so intolerable that a reasonable person in the plaintiff's position would feel compelled to resign.

39. As a direct and proximate result of Defendants' violations of law, Plaintiff has suffered loss of employment, lost wages and benefits, emotional distress, sexual assault, physical assault, mental anguish, loss of self-esteem and loss of dignity. Plaintiff is entitled to economic and non-economic damages in an amount to be proved at trial.

40. Plaintiff is entitled to reasonable attorney fees, costs and expert witness fees pursuant to 42 U.S.C. § 1988, ORS 659A.885, ORS 20.107 and 42 USC §2000e-5.

41. Defendant's conduct was carried out with wanton or reckless disregard for Plaintiff's civil rights. Punitive damages should be assessed against Defendants to deter it from such conduct in the future.

42. Plaintiff dual-filed claims with BOLI / EEOC relating to the same acts alleged above on October 28, 2023. BOLI undertook an investigation and, on October 28, 2024, found substantial evidence of both discrimination and retaliation against Defendant. On October 28, 2025, BOLI issued a right to sue letter authorizing Plaintiff to file her case in court within 90 days from that date, which Plaintiff has done.

### FIRST CLAIM FOR RELIEF
**(42 U.S.C. §. 2000e *et seq*. Title VII of Civil Rights Act on 1964: Disparate Treatment and Hostile Work Environment Discrimination)**

43. Plaintiff realleges paragraphs 1 through 42 as though fully set forth herein.

44. Defendant violated 42 U.S.C. 2000e-2(a)(1) by subjecting Plaintiff to a sex based hostile work environment that altered the terms and conditions of her employment and resulted in her constructive discharge. As part of this work environment, Plaintiff was subjected by Gicker to verbal and physical assaults, including rape, and conduct and intimidation of a sexual nature that was unwelcome, sufficiently severe or pervasive to alter the conditions of the

plaintiff's employment and create a sexually abusive or hostile work environment that plaintiff reasonably perceived the working environment to be abusive or hostile. The work environment resulted in the constructive discharge of Plaintiff since the work environment was so intolerable that a reasonable person in the plaintiff's position would feel compelled to resign, and because plaintiff did resign, as desired by Defendant, because of the intolerable and hostile work environment.

### SECOND CLAIM FOR RELIEF
(42 U.S.C. §. 2000e *et seq*. Title VII of Civil Rights Act on 1964: Retaliation)

45.    Plaintiff realleges paragraphs 1 through 42 as though fully set forth herein.

46. Because Plaintiff repeatedly opposed and resisted the sexual harassment of Gicker, Defendant violated 42 U.S.C. 2000e-(3)(a) by retaliating against Plaintiff by engaging in the conduct referenced in paragraph 17, above. Had Plaintiff not opposed the sexual misconduct and harassment by Gicker, the retaliatory conduct would not have occurred. The retaliatory conduct alleged herein, both individually and collectively, is the kind of actions that would have dissuaded a reasonable worker from making or supporting a charge of discrimination and resulted in a constructive discharge of Plaintiff's employment.

### THIRD CLAIM FOR RELIEF
(O.R.S. 659A.030(1)(a)-(b) - Disparate Treatment and Hostile Work Environment Discrimination)

47.    Plaintiff realleges paragraphs 1 through 42 as though fully set forth herein.

48.    Defendant violated O.R.S. 659A.030 by subjecting Plaintiff to a sex based hostile work environment that altered the terms and conditions of her employment and resulted in her constructive discharge. As part of this work environment, Plaintiff was subjected by Gicker to verbal and physical assaults, including rape, and conduct and intimidation of a sexual nature that was unwelcome, sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create a sexually abusive or hostile work environment that plaintiff reasonably

perceived the working environment to be abusive or hostile.  The work environment resulted in the constructive discharge of Plaintiff since the work environment was so intolerable that a reasonable person in the plaintiff's position would feel compelled to resign, and because plaintiff did resign, as desired by Defendant, because of the intolerable and hostile work environment.

### FOURTH CLAIM FOR RELIEF
(O.R.S. 659A.030(1)(f) - Retaliation)

49.   Plaintiff realleges paragraphs 1 through 42 as though fully set forth herein.

50.   Because Plaintiff repeatedly opposed and resisted the sexual harassment of Gicker, Defendant violated O.R.S. 659A.030(1)(f) by retaliating against Plaintiff by engaging in the conduct referenced in paragraph 17, above.  Had Plaintiff not opposed the sexual misconduct and harassment by Gicker, the retaliatory conduct would not have occurred. The retaliatory conduct alleged herein, both individually and collectively, is the kind of actions that would have dissuaded a reasonable worker from making or supporting a charge of discrimination and resulted in a constructive discharge of Plaintiff's employment.

### FOURTH CLAIM FOR RELIEF
(O.R.S. 659A.199 - Retaliation)

51.   Plaintiff realleges paragraphs 1 through 42 as though fully set forth herein.

52.   Plaintiff reported information to Defendant regarding Gicker's inappropriate sexual conduct toward Defendant's clients that she reasonably believed to be in violation or state or federal law, rule or regulation.

53. Because Plaintiff repeatedly opposed and resisted Gicker's inappropriate sexual conduct toward Defendant's clients, Defendant violated O.R.S. 659A.199 by retaliating against Plaintiff by engaging in the conduct referenced in paragraph 17, above.  Had Plaintiff not opposed the sexual misconduct the retaliatory conduct would not have occurred. The retaliatory conduct alleged herein, both individually and collectively, is the kind of actions that would have

dissuaded a reasonable worker from making or supporting a charge of discrimination and resulted in a constructive discharge of Plaintiff's employment.

**WHEREFORE**, Plaintiff requests a trial by jury and requests the Court should grant judgment in favor of Plaintiff and against all Defendants and grant the following relief:

1. On all Plaintiff's Claims for relief, an award of economic damages including lost wages, lost fringe benefits, lost benefits and pre-judgment interest in an amount to be determined at trial;

2. On all Plaintiff's Claims for relief, an award of damages for mental and emotional distress, and other compensatory damages in an amount to be determined at trial;

3. On all Plaintiff's Claims for relief, punitive damages in an amount to be proved at trial;

4. On all Plaintiff's Claims for relief, an award of attorney fees, costs and disbursements;

5. On all Plaintiff's Claims for relief, a Declaration that all Defendants violated Plaintiff's rights to be free from sexual discrimination and retaliation under state and federal law;

6. Such further or alternative relief in favor of Plaintiff as the Court deems appropriate.

/ / /
/ / /
/ / /
/ / /

DATED this 21st Day of January, 2025.

By    s/Matthew C. Ellis
**MATTHEW C. ELLIS, OSB No. 075800**
Matthew C. Ellis, PC
621 SW Morrison, Ste 1025
Portland, OR 97205
(503) 345-5497
matthew@employmentlawpdx.com

Plaintiff demands a trial by jury.

By    s/Matthew C. Ellis
**MATTHEW C. ELLIS**
OSB No. 075800
(503) 345-5497

**Page 16 – Complaint**